Well, why don't you come forward to the lectern so we can hear you loud and clear. And I apologize. If you'd like for me to speak up at any point, please let me know. Your Honors, we have a motion to supplement the administrative record pending. This regards certain prior rules manuals for the other limited volume exchanges. And this morning we received a document package with the CD enclosed. This was provided by the Securities and Exchange Commission and is postmarked February 3rd. This here contains the rules manuals for the trade point limited volume exchange as well as the successor entities which would be the Vertex Stock Exchange and then SWX Europe. These are very material documents and these were provided in response to our FOA requests. We've been fighting for these documents since August. And you say there is a motion there's a motion pending. Is that what you said? Correct, Your Honor. Does it cover the documents that you and refer to the documents which you're now mentioning? It does. What we had done is through our own independent research, we had investigated the trade point financial networks prior history and the rules manuals. And we had obtained copies through our own research and then also through prior FOA requests. And those copies are uncertified. There are simply copies that we obtained from our own research as well as FOA. But we've asked for certified copies to be filed in the motion to supplement. And there are additional manuals here that range to 2009 which we believe are material and likely dispositive of this appeal. Okay. Now what's the motion precisely? What precisely is the motion? Let's stop the argument time and we'll restore those minutes. But what precisely is the motion that you said has already been filed and is pending? I believe it's entitled Motion to Supplement the Administrative Record.  Ah, looks like November, November the 24th. All right. Well, why don't you proceed with your argument. The motion, I don't, frankly, don't recall whether that motion, there's been any disposition, whether there's been an order to take it with the case. But the court will consider the motion and your comments this morning. But why don't you proceed with your argument. And if I may, before we begin, we've made a copy for our own records. May I submit this as evidence for this proceeding? Well, I'm not sure that that would be appropriate and particularly at this late point in time before argument. I think your best course is simply to proceed with your argument and let any filings that you may have made speak for themselves and the court will take those up when the case is considered. Thank you, Your Honors. It's your contention that this material decides the case, the outcome of this case? I'm following, I'm not following what you're saying. Correct, Your Honor. The primary argument on appeal is the exercise of self-regulatory powers. Thank you. May it please the court. Counsel, you may proceed. I am Michael Stegowski, Counsel for Automated Matching Systems Exchange. Mr. Stegowski, are you the author of the brief we have in this case? I am, Your Honor, yes. We have a colleague who's not a member of this panel who frequently tells people that are here to argue that he never reads footnotes so that if you have something of importance that you think in the case ought to be presented, put it in the body of the brief and as I was reading your brief, I noticed that in 56 pages, you have 46 footnotes, some of which take up a little more than a half a page. I tell you that I've read all of the footnotes but when they're reduced size type, it gets a little tedious as you go along so I would suggest that you might take that into consideration the next time you appear before our court at least because you may get our colleague and he won't be able to know what you've said about half of the time. And thank you for your patience, Your Honor. I'll definitely take your note under advisement for the future. Thanks. Your Honors, throughout life, we all have an opportunity to speak about what it is that we do for a living. At times, I have an opportunity to discuss this case generally with friends and the first thing I suggest is we are litigating against a federal government agency and the question that I receive in response is, well, what did you do wrong? Nothing, I say. In fact, we initiated a lawsuit. The next question would be, well, how much money are you seeking? And I respond, none. In fact, we're not seeking any monetary damages. All we're seeking is for an agency to process an application and we're fighting to be regulated. I am the Chief Regulatory Officer of AMSI. Sitting to my right is Gregory Wilson. He is the Chief Executive Officer. Now, in the record below, you will notice reference to two other entities, one of which is Convergent Securities. I am the former Chief Executive Officer that was a registered broker-dealer. I headed the private placement of securities. Mr. Wilson owns and operates a second broker-dealer to this day. That broker-dealer is Variable Investment Advisors, Inc., and one of the business lines included with that firm is the operation of an alternative trading system. In fact, Mr. Wilson has been operating one for 15 years and he's one of the first applicants for an alternative trading system. Automation has changed our lives. It continues to change our lives every day. And many years ago, if you were planning a business trip or vacation, you may speak to a travel agent and seek a recommendation, where to go, where to stay, maybe even what activities to undertake while you're there. Today, the vast majority of us go online. We make our own trip. We decide our own hotels and activities. This is the core of AMSI, Fully Automated Matching Systems. In essence, we operate as an exchange, a virtual stock exchange, where each one of the member firms will be fully automated matching systems. This will be a portal by which, or multiple portals, by which an investor can enter on into this exchange and enter into securities transactions on one member's site, or through what we call an order routing functionality, enter a transaction onto one member's site and have that routed for execution to a second member's site. Now, this entire process would happen underneath the umbrella, this regulatory structure we call AMSI. If there's only two things that I'll ask of this panel, above all else, after all the documents you've reviewed and all the argument you've heard, they're the following. Number one, remand this matter with instructions to the SEC to indicate what conditions on approval they would require. Well, they have told you, haven't they, that you need to be a self-regulating organization, but you don't qualify for that, right? Or have I missed something in your 56 pages here? Well, we spent a great deal of time in our briefs criticizing what the SEC has done in this particular instance, and I acknowledge that. In fact, I think there's a great agency, but in this particular instance, I believe they failed, and they failed repetitively. Now, the best way that I can respond is to tell you what should have the SEC done and what should they still do, and the first of which, the first part of the exercise, will be to identify whether any statute, rule, or regulation is being violated. They've sat on this application for two years, and they can't identify a single one. Number two, what they should do, second, is identify the specific regulatory gaps, the specific concerns they have with the application, and once they identify those specific concerns, those specific regulatory gaps, then they should set specific conditions on approval. Maybe I'm not understanding this completely, but as I understand it, you've applied to be an exempt exchange, is that correct? Correct, Your Honor. Correct. And it's the SEC's position that an exempt exchange cannot have the self-regulatory powers. Do I understand that correctly? I'm not asking you to speak for the SEC, but is that understanding? That is their primary argument on appeal, yes. Why do you want the self-regulatory powers? What if you just submitted the application for exempt status and stopped there? Explain to me what's in it for you. Absolutely. And the answer involves regulation ATS. Since the adoption of regulation ATS, any system which discharges all of the regulatory functions is required to register as a broker dealer and then submit to the disciplinary powers and oversight of a second entity, an SRO. This is key distinction between what is a limited volume exchange and an alternative trading system. As an exchange, we would be self-regulating our members, and hence we would report directly to the SEC. So if you were simply a limited volume exempt exchange, who would regulate you without the self-regulatory powers that the SEC is complaining about? Where does the regulation come from? That's a great question, Your Honor. And the best example we can provide is in the trade point manuals, and you'll find that in the motion to supplement the administrative record. The statement that a limited volume exchange has not exercised what powers? The self-regulation. Well, let me ask the question in a different way then. Are there limited volume exempt exchanges that do not exercise self-regulatory powers in existence right now? There's only one limited volume exchange that we are aware of in existence now. And from our research, every limited volume exchange has exercised to some degree self-regulatory powers. And since the adoption of regulation ATS, the commission has made clear that that is a requirement for any exchange. So if you become a limited volume organization, you, in essence, will be your own regulator? Is that, or how does that, how does that work? Great question. And there's a two-tier regulatory structure here. And this is, it predates the commission's own existence. And you'll see references to treatise material, as well as an 1888 case of Belton v. Hatch. Stock exchanges have been regulating their existence. Now that the commission is there, the way that it works is that we self-regulate our members subject to the commission's oversight. So you would become a SRO? Well, the commission is taking objection to that specific term, and hence we've suggested the limited volume. The reasonable facsimile thereof, is that right? That is correct. Okay. Now, we're not asking for anything novel. If you look back at the trade point and the lunch exemptions, the orders granting them, this is exactly what the commission had done. These are the only two applicants in the last 80 years. And what they had done is set up specific conditions on which these exchanges could operate. And if the exchange violated any one of those conditions, well then the commission can revoke the exemption. Give me a sense of the volume difference between a limited volume exchange and an exchange. Great question, Your Honor. And the SEC has answered that in the trade point filings. The way that they've interpreted limited volume is staying below the lowest average daily trading volume of any registered national exchange. So hence this is a temporary, it's a conditional exemption. It's a startup provision. It gives us an opportunity to begin operations until we hit that level of transaction volume where we would be required to register. So your description of a limited volume exempt exchange is that it's a temporary transitional phase before you become the big boy exchange? And going back historically, this provision, this limited volume exemption, was designed for the regional stock exchanges. Stock exchanges like the St. Paul, Minneapolis Stock Exchange. And following the adoption of the Exchange Act, this would be a provision to allow them to continue to operate without all the burden of registering as a full national securities exchange. And so who would look over their work product or activities in that situation, beyond just internally? And Your Honor, are you asking me with respect to the original, the 1930s exchanges? No. You mentioned the St. Paul Stock Exchange. I guess I'm not understanding what your point was with that. These were regional stock exchanges. I understand that. And they were allowed to continue to operate when the Exchange Act was adopted. So this was a temporary provision to allow them to continue without the disproportionate burden of registering as a national exchange. So they are self-regulating organizations without any connection of oversight outside of themselves. Is that right? Well, we believe that to be true. Now, we requested the FOA manuals with respect to these earliest exchanges, including the Honolulu Exchange, which continued to 1977. The Commission does not have any support in the record that these exchanges had not exercised self-regulatory powers. But we believe that they had. We believe that they're, this is the core. These were run as private clubs. So if a member didn't meet their commitments or engage in, let's say, unscrupulous behavior, they would be sanctioned internally by the Exchange. Is there anything prohibiting you from registering as an exchange? Is there about the limited volume exemption that you're seeking for a reason or because you're too small? Or what's stopping you from just saying, all right, we'll register. Then we can have all of these powers, these SRO. We will be an SRO. And they'll call us that. And we'll call us that. And I'm going to answer that question. And I'll reserve the remainder of my time. But there are various reasons that we've chosen this. And as the applicant, we're entitled to we'd like to file. There are certain economic benefits for us, things such as allowing unregistered securities to trade on this platform. And hence, this is the decision we've made in the form of application we've identified as the appropriate one. Thank you. Thank you. Mr. Shirey. Good day, Your Honors. Good day, Your Honors. William Shirey for the Securities and Exchange Commission. The Commission rejected AMC's exemption, exemptive application, because the Commission determined that it was inconsistent with the Exchange Act. AMC wants to be what's called a self-regulatory organization. That's an organization that has the ability to enforce the federal securities laws. It's an organization that is essentially deputized under the close supervision of the Commission to regulate its members. You have lots of self-regulating organizations now, don't you? We do, Your Honor. We have approximately 20 right now. All of them are registered exchanges, registered clearing agencies, or registered national securities exchange. The critical defining term there is registered. AMC, however, has determined that it wants to be an exempt exchange. But Congress in 1975 was very concerned about the exercise of self-regulatory quasi-governmental authority that we're talking about. And Congress overhauled the Exchange Act. And as we discussed in the exemptive order and as we discuss in our briefs, Congress carefully defined what organizations could be SROs. And not surprisingly, all of these are registered entities. As relevant here, it's a registered exchange. Is there something about that registration that is some addition, maybe that's where you're going, but is there some additional screening, backgrounding? What's involved in the registration that makes the SEC feel more comfortable about giving these self-regulatory powers to the registered? Well, first of all, Your Honor, it's the SEC's contention that Congress looked at this area very closely. And Congress actually decided what entities would exercise it. The Congress didn't actually allow the Commission to expand the list that's in 3.826. But Your Honor's precisely correct. There are considerations that even if the Commission did have the authority to allow an entity to be an SRO that wasn't in that list Congress provided, why the Commission wouldn't? And it includes what's specified in Section 6 of the Exchange Act that was substantially overhauled by Congress in 1975. Very rigorous and demanding standards were imposed for exchanges that want to register and become so-called national securities exchanges. Perhaps even more importantly, the vast number of powers were added for the Commission to exercise oversight over registered exchanges and other SROs. In Section 19, it's Sections 19B through Section 19H, it was a substantial overhaul that Congress did in 1975. As well, in Section 21D and E of the Exchange Act, Congress added additional powers for the Commission to exercise with respect to SROs. Those powers include, among other things, the ability to go into federal court and order an exchange. No SRO rule can take effect until the Commission approves it. It includes the ability to, without asking the SRO first, to modify any of their rules. It includes the ability to review any disciplinary decisions. It includes the ability to mandamus members of an SRO's board of directors and other officers. So what AMC has proposed, their self-regulatory powers, the SEC would not have that same governing oversight? Correct. Section 19 is limited. Our authority under Section 19 is limited to those entities that are SROs under the statute. That's only registered exchanges. AMC would be an exempt exchange. It sort of makes rumblings of opting into Section 19. The regime doesn't work that way. Congress, first of all, specified who could exercise these quasi-governmental powers and who could not. And then it provided extensive registration mechanisms and oversight mechanisms to make sure that the Commission was constantly monitoring the exercise of these powers, and that only appropriate private entities were exercising these quasi-governmental powers. And so, Your Honor, the Commission looked at what Congress did in 1975, and it decided that AMC's made mention of WANCH, I think I'm saying that correctly, the 1991 Exemptive Exchange. There's only been two exemptions granted since those 1975 amendments. One was WANCH, subsequently called the Arizona Exchange. That was in 1991. The second one was in the late 1990s. That's TradePoint. That was actually a UK-registered exchange that wanted limited operations in the United States, essentially to make its trading platform in the UK available to a limited number of U.S. participants. What the Commission said in both of those exemptive orders, and it has been the Commission's consistent view since those 1975 amendments, is that the Section 5 exemption exists to relieve small exchanges of the SRO obligations. The Commission said that in both the WANCH and the TradePoint orders. So what you have here, Your Honors, is a situation where AMC is seeking an exemptive application that in the Commission's view exists to actually relieve an exchange that otherwise would have to register of those SRO obligations to allow them not to register, to seek an exemption. But as a result, they also become subject to less registration. They avoid the demanding registration requirements, and they also avoid the extensive oversight mechanisms that Congress established. It's a tradeoff. Who has the oversight over the limited volume exempt exchanges? Well, first, Your Honor, I should clarify that in our understanding, no limited volume, neither of those limited volume exempt exchanges are still in operation. Both ceased operating under exemptive orders in approximately 2009 period. Did they transition into? I believe that TradePoint actually just now operates in the U.K. and Switzerland, and I am not perfectly sure about the Arizona exchange. I'd be on dangerous territory if I started to speculate. So the critical point is that with respect to those two exempt exchanges, they were subject to direct Commission oversight themselves, but they did not possess, neither of them possessed, authority to investigate, examine, prosecute, and adjudicate enforcement actions against their members for violations of the Exchange Act. That power existed either with other SROs to which these, their members also were members, or resided with the Commission, but it never, it never resided with these entities. AMC is, in essence, saying to you that you are overusing your Chevron deference to promulgate rules under general legislative mandates to handcuff limited volume entities or propose limited volume entities such as they propose, and since there's only been a couple since, what'd you say, 1975, that might be a fairly decent argument that we ought to think about here. Well, Your Honor, our first point is that you don't even need to get to Chevron deference. Congress spelled out in Section 3A26, without even having to get to Chevron, who could be an SRO? Who could exercise these powers? And it's a registered exchanges, it's registered national securities associations, and it's registered clearing agencies. It's not exempt exchanges. It's not as though in 1975 Congress wasn't aware that there were exempt exchanges out there. Congress certainly was aware of that, A. And B, you know, when one looks at the, say, for instance, the Senate report that is cited in both, I think, our brief and in the exemptive, the denial of the exemptive application, you actually read through that. It's frankly an extraordinary, it's extraordinary how concerned Congress was at that time about entities, private entities, that's what we're dealing with here, private entities exercising quasi-governmental powers, being deputized to enforce the securities laws. Well, the New York Stock Exchange does that. And they are a registered exchange, Your Honor. And they are a subject to every- The Chicago Grain Exchange does that, right? Excuse me, Your Honor. Chicago Grain Exchange? I believe, and I may be wrong here, I believe they're a CFTC regulated entity. You don't deal with the grain exchanges, do you? That is my understanding, Your Honor. That's the Commodity Future Trading Commission that regulates those. But the critical point, Your Honors, is that the Commission has never given any, either of these exempt exchanges that post-1975, the authority to enforce the securities laws, to make rules, to go on site and examine these entities, their members, books and records, to make sure that they're complying with the securities laws, to then investigate potential Exchange Act violations, to prosecute their members for Exchange Act violations, and to then adjudicate them. You will not, you know, I know Mr. Stogalski has talked about the trade point manuals. You won't see that in the trade point manuals. The trade point was, if I just step back for a second, it was a UK exchange that the United States was, the SEC was granting a limited exemption for, a limited volume exemption, so that they could allow residents, certain members in the United States to trade on that platform. It was an exchange that was governed by UK law, even after the Commission granted the exemption. It would be extraordinary for the United States Securities and Exchange Commission to empower a foreign registered exchange to actually enforce U.S. securities laws. It didn't happen. And it didn't happen in the watch setting either. If, in this application, if it did not have this proposal for the self-regulatory provisions, has the SEC looked, I mean, is that the, that's the reason it was denied? In other words, are there other faults in the application that it's not limited volume? There's some other reason it can't be exempt? Or did the SEC just focus on the... Your Honor, I want to be very sensitive here, because I can only speak for the staff's review at this point, because the commissioners, you know, decide what they decide, and I want to be respectful of that. The commission in its exemptive order noted at least several other, one other major threshold critical concern, and that's whether AMC's business model even qualifies as an exchange. There's various reasons, because these ATSs that would, they're proposing would be members. They're, they're actually the exchanges. So, so there's been a lot of revision to AMC's route to sort of, I think, try to comply with the staff's concern that, look, these are the exchanges. That's what ATSs are, essentially, as we talk about in our brief. You're not actually proposing to operate an exchange. So, so there's that threshold issue that the commission would have to look at. Their proposal is, their proposal is kind of more like a shopping center for stock than a... I think, you know, Your Honor, the AMC actually said in one of their early email exchanges, they actually said they were proposing to operate a... Theirs was more like a shopping mall than the traditional auction center, and I actually think that's not a fair thing where, you know, you go to the shopping mall, there are all these individual stores, but you don't actually think of all the buyers and sellers in each store always sort of constantly interacting with the same, within the same platform there. But there was that issue. Also, there was a comment letter during this period by First Trade, I believe, where they identified a slew of other concerns with AMC's application. The commission hasn't even dealt into those yet. So there are, there are potentially a number of concerns, but we have to get through this first... If I may, and you can correct me if I'm wrong, but my understanding was that AMC was end of analysis. And I think that's wrong. I mean, that's not certainly how the commission has ever approached any of the exemptive orders. The commission has always imposed some degree of conditions, for instance, even going back to the 1935 exemptive orders, to make sure that the folks who are operating these exchanges were doing so consistent with the public interest and the protection of investors. And we don't think that that's appropriate. That makes any degree of sense. That's not how exemptive orders typically work, which are inherently discretionary. In your brief, you include Table A, which is a, you've prepared a chart. It compares one form of the application with amendments. And you point out that, or your conclusion is that what they did was take out SRO, self-regulatory organization, and substitute limited volume exempt regulatory organization. They just quit using that name. Right. They've sort of made their own terminology, but . . . Can you give me an example? Can you give the court an example of what else you would have expected to see in the amended applications that would be more conducive to this request? Again, I don't want to speak for the commission, but I think it's fair to say that the commission has, since the 1975 amendments, never deputized one of these exempt exchanges to actually go out and enforce the securities laws. And in AMC's application, they actually say that they will enforce the securities laws as to their members and the associates of their members. And that is, I think, fair to say, sort of the North Star of problematic issues here. But there are a host of others. AMC across the board, as they said, I believe it was in response to Judge Beam's question, notwithstanding their nomenclature change, they really want to be an SRO. And as you heard today from AMC, it's critical to their business model. They want to attract ATS's automated matching systems to be away from competitors, particularly what's called FINRA, the one National Securities Association, a registered securities association that has their SRO powers. They want to attract members, ATS's, away from that to the AMC regulatory model. AMC makes that very clear, even in their last correspondence, dated April 2015, public comment that they submitted on their second amended application, they actually say they want to be a, quote, dedicated SRO for automated matching systems. Notwithstanding this change in terminology, AMC proposes throughout their rulebook, in their exemptive application, they talked about it in the district court proceedings, and they talked about it even in their last public comment on this. AMC plans to be an SRO. They've changed the names, but it's an SRO they're talking about, and that's the commission's position, both, even without having to get to Chevron, that that's not a permissible option. Any further questions, Your Honor? All right. Thank you very much. Thank you. How much time does Mr. Stogaski have? One minute, Your Honor. All right. Mr. Stogaski, Mr. Shirey took a little extra time to complete his answer, so the court will allow you an extra minute. Thank you. So add a minute to your time there, and you can finish up. Thank you very much. Your Honors, the commission has represented that they have never allowed a limited volume exempt exchange to exercise self-regulatory powers after the 75 amendments. You'll see in the docket below, that's false. They've exercised disciplinary powers over members. They can sanction members, and in fact, the trade point, you'll see reference, that they would empower English arbitrators to apply U.S. securities laws in their proceedings for any U.S. members. Now, we're not asking for much from the commission. We're willing to comply. We've offered several amendments. Just tell us what you need us to do, what amendments you need. If they're substantive, or if it's just terminology, we'll comply. We're willing to. We spent a lot of resources to do it. Is that really the role? I was going to ask this question. I get the sense, as I read the record, that there was a continuing request from the appellant to the SEC to tell us what we can do to be compliant. Absolutely. Is that actually the role, do you think, of the SEC and its staff to provide you with an applicant with detailed instruction or suggestions as to how to make your applications acceptable? Well, here's the problem with their current order. We have no idea what's wrong. We could submit 100 applications and have a moving target. The whole time it was about this definition of exchange, and at the eve of the processing period, they deny it on another ground. All we're asking is to give us that opportunity to know how to correct it. What's worse, another exchange can come, restyle our application, file it, and they can be approved. In essence, the Commission doesn't want to create any precedent on this limited volume exemption, and that's all we're asking for. We want to comply. We just need to know how. I see my time is up. Just very briefly, we've also included a chart. I recommend this may be a helpful point. This is on page 78 of the August 31st brief, and this is just kind of a quick summary of the self-regulatory powers on the prior exchanges. Are there any further questions? I don't think so. Thank you very much. Thank you very much. Counsel, interesting case, and it's been well argued. It is submitted.